FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

DEC 13 2017

JAMES N. HATTEN, Clerk
By⏤⏤⏤ Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**<br>**ex rel. Ashley Vandiver** | ) ) ) | |
| **Relator,** | ) ) | **1:17-CV-5120** |
| **v.** | ) ) | Civil Action No. _____<br>**Jury Trial Demanded** |
| **DeVry University, Inc., DeVry**<br>**Education Group, Inc., Adtalem**<br>**Global Education Inc.** | ) ) ) ) | **FILED UNDER SEAL** |
| **Defendants.** | ) ) | |

## COMPLAINT

The United States of America by and through Relator Ashley Vandiver, brings this action under 31 U.S.C. §§ 3729-3732 ("False Claims Act") to recover all damages, penalties, and other remedies established by the False Claims Act on behalf of the United States and Relator and would show the following:

### INTRODUCTION

1.     The for-profit college chains in America are in business for one reason—to make money. They have a long history of deceptive marketing practices and deplorable job placement rates. The product that they foist on students tends to be worthless and/or they recruit people who cannot possibly benefit from what they offer. Why then do they recruit so many and produce so little? It is because they

get so much federal money. The Government is essentially paying for-profit colleges for its citizens to fail—thereby obtaining little or nothing for all that money.

2. One large focus is on military related students for which the Government pays tuition (and, as a bonus, counts as non-government funds on the 90/10 requirement). While for-profit colleges have less than 10% of the general population of students, they have over 30% of the veterans who use the GI Bill. Forty percent of post-9/11 GI Bill tuition has gone to for-profit schools. Many for-profit colleges spend more money on marketing and recruiting than on teaching and classes. Much of that marketing and recruiting budget is focused on military related students. Perhaps no other school has focused so much on the military as has DeVry. In 2014, 25% of all DeVry students were military.

3. This case concerns express federal regulations and contract requirements that DeVry employees were aware of but refused to follow in order to increase their share of Government tuition subsidies for U.S. military personnel. This includes circumventing the strict recruiting regulations as well as state licensing requirements, paying recruiters contingent on the number of recruits, and violating the 20 student requirement for on-base education services.

## JURISDICTION AND VENUE

4. This action arises under the False Claims Act, 31 U.S.C. § 3729, et seq.

-2-

5.     This court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) in that Defendants live in this jurisdiction, do or transact business in this jurisdiction, and portions of the violations of the False Claims Act described herein were carried out in this district.

6.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732(a) and (b).

7.     Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) and under 31 U.S.C. § 3732(a).

## THE PARTIES

8.     Defendant DeVry University, Inc. is owned by DeVry Education Group, Inc. which amended its application to transact business on May 31, 2017 by changing its name to Adtalem Global Education, Inc. Defendant DeVry University, Inc. and DeVry Education Group, Inc. are located at 3005 Highland Parkway, Downers Grove, IL with formation dates of June 20, 2003 and December 8, 2003, respectively. Adtalem Global Education Inc., formerly DeVry Education Group, is a United States corporation based in Downers Grove, Illinois, that operates several for-profit higher education institutions, including Adtalem Educacional do Brasil, American University of the Caribbean School of Medicine, Becker Professional Education, Carrington College, Chamberlain College of Nursing (k/n/a Chamberlain

-3-

University), DeVry University and its Keller Graduate School of Management, Ross University School of Medicine and Veterinary Medicine (all collectively referred to as "DeVry").

9.     Relator Ashley Vandiver has over 10 years of experience working with military recruiting for higher education institutions.

## AGREEMENTS AND REGULATIONS

10.     Each of the colleges accepting Government money for military related students enters into a Memorandum of Understanding with the DOD (DOD MOU). DOD attempted to pull back the for-profit colleges by restricting recruiting in the DOD MOUs.     In 2012, President Obama signed Executive Order 13607, "Establishing Principles of Excellence for Educational Institutions Serving Service Members, Veterans, Spouses, and Other Family Members" with the intent of banning all deceptive and aggressive recruiting practices by for-profit colleges. All for-profit colleges are bound by Executive Orders through their DOD MOUs.

11.     The Executive Order also directed the DOD, VA, and DOE to "ensure that these educational institutions ... prevent abusive and deceptive recruiting practices that target the recipients of Federal military and veterans educational benefits," which included the GI Bill. *Id.* at Sec. 2. Section 4 of the Order required a plan to "end fraudulent and unduly aggressive recruiting techniques on and off

military installations, as well as misrepresentation, payment of incentive compensation, and failure to meet State authorization requirements[.]" DOD and the VA sent the Order to all for-profit education providers in 2012 and required a written agreement to comply by June 30, 2012.

12. In November 2012, DOE held its Fall Conference and told for-profit schools that starting in the spring of 2013, DOD would be enforcing the following policies at U.S. military installations:

        a. Institutions were only allowed on bases to provide education.
        b. Marketing firms could not have access to the bases.
        c. Institutions could only have access via a written proposal to the base education officer with:
            i. A signed DOD MOU;
            ii. Proper charter or license by the State Government for that base;
            iii. State approval for the use of veteran's education benefits;
            iv. Accreditation of course offerings by an accrediting body recognized by DOE; and
            v. An on base student population of at least 20 active duty military students.

13. In order to implement the final DOD rules, it published its Information No. 1322.25 dated March 15, 2011. These were directions to the Responsible Education Advisor to control access of for-profit colleges to conduct on-base recruiting. They were to ensure that the colleges did not "[e]ngage in unfair, deceptive, or abusive marketing tactics, such as during unit briefings or assemblies;

engaging in open recruiting efforts or distributing marketing materials on the DOD installation at unapproved locations or events." Additional DOD rules were published in final form in 79 FR 27732 to go into effect July 14, 2014 (requiring new DOD MOUs within 60 days). The colleges entered into new DOD MOUs in 2014 incorporating all these requirements. This included banning incentive compensation (including commission and bonuses) for recruiters based on securing enrollments or federal financial aid. It also banned multiple unsolicited contacts and banned relationships with "lead generators" for the purpose of securing enrollment of Service members or access to federal financial aid.

14. As the President and the DOD tried to pull back from some of the improper recruitment tactics, for-profit schools just got more aggressive and trickier. Military recruiting became the cash cow of for-profit colleges and recruiters engaged in no holds barred recruiting efforts.

## **FACTUAL ALLEGATIONS**

A. Knowledge and Materiality

15. Relator has focused the case on only four significant violations. (1) Improper recruiting and lead generation. (2) Failure to license recruiters in states they recruited in. (3) Remuneration to recruiters based on enrollment, recruitment and/or recruitment activities. (4) Failure to follow the 20 student rule. As noted

briefly above, these requirements are generated from Executive Order, Federal Regulations, Department of Defense Instruction Number 1322.25 ("DODI"), and a DOD MOU agreement between DOD and DeVry.

16.    DODI contains the main DOD regulations that DeVry military representatives had to follow as recruiters.  This document was created by Dawn Bilodeau, Chief for DOD Voluntary Education, and is the governing DOD regulation for colleges and universities regarding recruitment of military personnel. Dawn Bilodeau represents both the DOD and DOE and regulates schools that wish to work with the military.  DODI Section 3(d)(1) requires all institutions and agents to "[a]dhere to federal law, Reference (r), DODI 1322.19 (Reference (s)), and the cognizant Military Service's policies and regulations."

17.    The same year that Relator was re-hired by DeVry (2014), DeVry and the DOD signed an agreement (DOD MOU).  DeVry signed on July 15, 2014.  DOD signed July 16, 2014.  The agreement term ran from July 16, 2014 through July 15, 2019 and included sub-agreements with military divisions.  One of the first things the DOD MOU articulates is that "**Eligibility** of DOD recipients **is governed by** federal law, **DOD Instruction (DODI) 1322.25**, DOD Directive 1322.8E, and the cognizant Military Service's policies, regulations, and fiscal constraints."  *Id.* (emphasis added).  It also clarifies that the "MOU is subject at all times to Federal law and the rules, guidelines, and regulations of the Department of Defense.  Any

conflicts between this MOU and such Federal law, rules, guidelines, and regulations will be resolved in favor of the Federal law, rules, guidelines, or regulations." *Id.* And, in Section 3, it states that all educational institutions must: "Sign and adhere to the requirements of this MOU, including Service-specific addendums as appropriate, prior to being eligible to receive TA payments." *Id.*

18.     These sections of the DODI and MOU show that DeVry had knowledge of what was required. Where DeVry deviated, it did so knowingly. They also show the importance of following these rules—or materiality. If the institutions do not sign and adhere to the requirements of the MOU, they are not eligible to receive Tuition Assistance ("TA") payments.

B. Improper Recruiting

19.     From 2014 when Relator was hired by DeVry until she was terminated on February 2, 2017, Realtor was one of the lead recruiters on DeVry's military team. Relator did everything she could to follow the rules and regulations, but was thwarted by DeVry management and ultimately fired for trying to get DeVry to comply with its federal obligations. The two issues over which Relator and management crossed swords most often was the illegal recruiting policies and the refusal to license recruiters in the states they worked in. When Relator learned from Dawn Bilodeau, Chief for DOD Voluntary Education, that DOD was serious about these recruiting issues, she tried to bring DeVry into compliance based on what Ms.

-8-

Bilodeau had said and written publicly.

20. Starting off on the first page of DODI 1322.25(1)(c)(1)(b), DOD focuses the policy: "All educational institutions providing education programs through the DOD Tuition Assistance (TA) Program: Will not use unfair, deceptive, and abusive recruitment practices." *Id.* Right after that, on page 3, (3)(d)(1)(b) states that "In accordance with Executive Order (E.O.) 13607 (Reference (g)): Educational institutions receiving funding from federal military educational benefits programs, such as the DOD TA Program, will: Prevent unfair, deceptive, and abusive recruiting practices that target Service members (as defined by the Dodd-Frank Wall Street Reform and Consumer Protection Act) and as stated in section 3 of Enclosure 3 of this instruction." *Id.*

21. On page 21 (3)(a), it clarifies that "**Contacts** by an educational institution with a Service member for the purpose of asking or encouraging the member to sign up for one of the educational institution's programs (assuming the program has some cost) **are considered personal commercial solicitations**." *Id* (emphasis added). The next subsection states: "Agents representing education institutions in the performance of contracted services are permitted DOD installation access only in accordance with the requirements of their contract and/or agreement." *Id.* In Section 3(e)(1)-(2), DOD insists that institutions and agents granted access to DOD installations may not: "Use unfair, deceptive, abusive or fraudulent devices,

-9-

schemes, or artifices, including misleading advertising or sales literature" or "Engage in unfair, deceptive, or abusive marketing tactics, such as during unit briefings or assemblies; engaging in open recruiting efforts; or distributing marketing materials on the DOD installation at unapproved locations or events." *Id.* If institutions have agents on base it is only to "advise or counsel students at the education center or at a location approved by the responsible education advisor." *Id* (4)(f)(1). All these statements are meant to convey that it is unacceptable for for-profit schools or their agents to contact Service members and that all contact must be initiated by the Service members themselves.

22. To make it clear that institutions and agents cannot circumvent the clearly prescribed uninvited solicitation of military personnel, the DOD MOU prevents the improper use of lead generators. "As part of efforts to eliminate unfair, deceptive, and abusive marketing aimed at Service members, educational institutions will: Ban inducements, including any gratuity, favor, discount, entertainment, hospitality, loan, transportation, lodging, meals, or other item having a monetary value of more than a *de minimis* amount, to any individual or entity, or its agents including third party lead generators or marketing firms other than salaries paid to employees or fees paid to contractors in conformity with all applicable laws for the purpose of securing enrollments of Service members or obtaining access to TA funds." *Id.*

-10-

23.     The Government also seeks to take away any incentive to engage in these types of recruitment practices by outlawing incentive pay whether by commission, bonus, or otherwise.     The MOU is very clear about incentive compensation.  Section 3(j)(2) states that educational institutions must:

> Have policies in place compliant with program integrity requirements consistent with the regulations issued by ED (34 C.F.R 668.71-668.75 and 668.14) related to restrictions on misrepresentation, recruitment, and payment of incentive compensation. This applies to the educational institution itself and its agents including third party lead generators, marketing firms, or companies that own or operate the educational institution. As part of efforts to eliminate unfair, deceptive, and abusive marketing aimed at Service members, educational institutions will:

> Refrain from providing any commission, bonus, or other incentive payment based directly or indirectly on securing enrollments or federal financial aid (including TA funds) to any persons or entities engaged in any student recruiting, admission activities, or making decisions regarding the award of student financial assistance.

24.     The Government has made it clear that it does not want any institution or agent to solicit military personnel, but to wait for Service members to reach out first.  All the rules and regulations are to promote this relationship and prevent

predatory recruiting practices. However, following these requirements is far less lucrative. DeVry has chosen to continue to solicit and target Service members contrary to these instructions and requirements, because it provides DeVry with more military students, more money, and a better 90/10 ratio.

C. Key Management for Military Team

25.    It is important to understand that there was no compliance specific to the military recruiting team and the directives changed at the whim of management, with few (if any) written policies. To the extent there were written policies, they were overwritten by the whim of oral or email instructions from management.

26.    Consistent with the Wild West mentality and the efforts to promote, encourage, and compensate aggressive recruiting, most of the people in the organization were provided considerable bonuses and incentives based on the number of Service members whose contact information was obtained and the number ultimately enrolled. Also, consistent with the unregulated environment, most of the time the recruiters skipped a step or two in the org chart and reported directly to people two or so steps above them.

27.    Here is a description of the organization over military recruiting at DeVry while Relator was there:

28.    The President of DeVry signed the DOD MOU concerning military

-12-

recruiting, but as far as Relator is aware, did nothing to make sure that any of that was incorporated into policy or flowed down to recruiters. It was an agreement in name only. The DeVry Education Group's ALIS team was responsible for state licensing for recruiters, but there was obviously no real accountability for that responsibility and, as shown below, DeVry had no interest in following the rules regarding licensing.

29.     From Relator's re-hire in 2014 through March 2016, Erika Orris was the highest report in the chain of command. Several departments, including the military team reported to her.

30.     Jenell Givelber worked under Erika Orris as National Director of Military Affairs until April 2015. Under Ms. Givelber were four regional managers: Hawthrone ("Harty") Herbert (West Coast), Tammy Vanderleest (Southern region), Mike Kruger (Northern region (Relator's husband)), and Ariel DeJesus (East Coast), as well as all of the recruiters. Oddly, but importantly, the recruiters reported directly to Ms. Givelber.

31.     In April 2015, Russ Gill was moved to the military team as the VP of Military and Veterans Affairs—where he remained until June 2016. During that time, all recruiters reported directly to Mr. Gill. The four regional managers reported to Ms. Givelber, who then reported to Mr. Gill.

-13-

32.    In March 2016, there was a large shakeup in management. Erika Orris was replaced by Joe Mozden. Many departments reported to Mr. Mozden including the military team. Mr. Mozden has remained in place to this day.

33.    In June 2016, there was a shakeup of military management. Greg Pace took over for Russ Gill (July 1, 2016). The entire military team (except Ms. Givelber and one other) were fired and told to reapply for new positions with new titles (under new management—Greg Pace). Mr. Pace divided the teams into East and West divisions and hired Mr. Herbert to manage the West (where he remained until recently). Until John Korsak was hired to manage the East (in October of that year), the recruiters reported directly to Mr. Herbert (except Realtor and one other who reported to Mr. Pace). Relator (East) and her husband (West) were re-hired as recruiters. John Korsak is still the East manager today (and recently taken over the entire U.S. team). At least until very recently, the recruiters reported to the managers and the managers reported to Greg Pace and Greg Pace reported to Joe Mozden. It is noteworthy that Mr. Herbert, Mr. Korsak, and everyone under them actively recruited on military bases.

34.    Jenell Givelber was replaced in June 2016 and was moved to a new position called Operation and Policy Manager until she was terminated shortly after Relator in February 2017.

35.    Importantly, what is absent from the entire structure is any form of real

-14-

compliance. There was never anyone responsible for compliance for the military team, and the directions on how to "comply" with Government regulations were generally more about how to circumvent the regulations. DeVry and its management were compensated for signing up Service members, not for complying with recruiting regulations. With big bonuses on the line, company revenue, and the 90/10 issue, there was tremendous pressure to do whatever it took to recruit Service members to DeVry.

D. Illegal Incentives and Remuneration

36.    If you are going to aggressively recruit Service members, you need to provide an incentive and make it clear that pay is based on recruiting success. That is exactly what DeVry did. From the outset, DeVry has rewarded "top producers." DeVry has taken them on lavish trips and given them cash. Years ago, Relator was in the top 7% sales for the company nationwide—called Diamond Pride. Relator said they were acknowledged and awarded for their production. More recently, DeVry has focused on more direct financial pressure and rewards. For a period, DeVry gave direct bonuses to advisors (like Laura Moriarty, but later stopped that program). Other departments at DeVry (other schools) also recruit the military and even the lowest level military recruiters receive direct quarterly bonuses for hitting their inquiry goals set by their military managers.

37.    For example, DeVry's sister company Chamberlin College of Nursing

(which recently changed its name to Chamberlin University), has a military team as well. Chamberlin's military team recruiters receive direct quarterly bonuses if they hit their personal quarterly goals (which is recruiting Service members). DeVry and Chamberlin work for the same organization, DeVry Education Group (now Adtalem Global Education, Inc.), and their military teams perform the same job. All compensation, for both military teams is based off of recruitment/soliciting military and veteran leads/inquiries. DeVry focuses all compensation decisions (good and bad) on meeting recruiting goals.

38.     In Relator's military team structure, managers are directly bonused based on recruiting results. They are held accountable for success or failure in recruiting Service members, and they hold everyone below them financially accountable for the same success or failure. DeVry pushes its military recruitment team to make the annual inquiry number goals, set by their military managers, so that military managers can receive their bonuses. Most of the managers receiving bonuses are actually directly soliciting and recruiting Service members themselves. However, whether in the field or not, the bonuses are measured by recruiting success.

39.     DeVry has a level of managers called Regional Managers of Military and Veterans Affairs (RMMVAs) (previously called Managers of Military Affairs (MMAs)) who are held to "inquiry accountability," meaning they are required to represent DeVry at military events and personally solicit Service members. For most

-16-

of the past few years, no one reported to them so they were just "super recruiters" who received annual bonuses based directly on their entire territory's inquiry production.

40.     This not only provided them an incentive to aggressively recruit, but also to demand more aggressive recruiting from each of the other recruiters in their region.

41.     Relator did not know that managers were receiving bonuses until she started dating her husband, Mike Kruger, who was a Manager of Military Affairs. Kruger mentioned that he received a bonus for his recruiting effort and the regions' inquiry goal. Kruger's compensation plan shows he was provided bonuses based on his and the team's inquiry collection for each fiscal year. This shows that managers were both recruiting and receiving bonuses based on the success of their recruiting efforts.

42.     In January 2017, management changed the purchasing decision of annual paid national events and sent out a final email detailing which events they would pay for which recruiters to attend. John Korsak sent this out in an email that had an excel spreadsheet attached showing all paid events purchased for the East Coast team. Relator noted that the "managers" were getting as many as double the paid events as the normal recruiters. The recruiters believed that the managers saved more paid events for themselves because they were easier to generate inquiries and,

-17-

therefore, bonus money.

43. It wasn't just managers who got bonuses for inquiries and admissions, but historically the Admissions Advisers also got bonuses, and upper managers got really big bonuses based on how many Service members were admitted to DeVry. The recruiters are required to get "inquiries", meaning contact information from Service members, and Admissions Advisors "turn them into" admitted students or convert them into applicants and then enrolled students. The Admissions Advisors have received bonuses in the past dependent on how many are actually admitted (or their jobs depended upon their conversion rates). Accordingly, they complain from time to time about the weakness of the inquiries (and management then places greater pressure on the recruiters to get higher numbers of better qualified inquiries). For example, on September 30, 2015, the Director of Admissions sent an email complaining about each lead the military team provided to her team as an inquiry and why they were not converting. Russ Gill took this (and other similar complaints) and cracked the whip down the line to get higher converting inquiries from the military recruiters for the admissions team. Around this time, Russ Gill admitted to Relator's co-worker, Laura Moriarty, that his bonus was extremely large (either half a million or a quarter of a million for just his bonus). So, there was a lot at stake for all of the managers and this led them to constantly pushing the recruiters to be more aggressive (and to violate the rules). In other words, due to the large financial gains

-18-

at stake, the managers placed constant and unrelenting pressure on the recruiters to be "more aggressive" (and violate the rules).

44. The recipients of the bonuses knew they were illegal, but the bonuses were such a fundamental part of what drove the military team and they were so effective, that when Relator offered the slightest concern about their propriety, managers conspired to protect themselves and punish her. This shows both that DeVry knew this incentive compensation was wrong and that they were inclined to retaliate rather than clean it up. It is indicative of their overall attitude about the federal regulations.

45. Relator raised an issue about the impropriety of the incentive compensation around the time Jenell Givelber was on FMLA maternity leave (January 2016). Ms. Givelber was called by her Manager of Military Affairs, Tammy Vanderleest, who then conferenced Mike Kruger and Hawthrone Herbert. Ms. Vanderleest called the managers to express concern that Relator and her fellow team member, Laura Moriarty, seemed to be questioning the bonus system. Jenell Givelber recommended her entire management team to go to HR and report Laura Moriarty and Relator, so that if Moriarty or Relator brought up the fact that the management team was receiving bonuses based on their production, them going to HR first would make it appear that Moriarty and Relator were just "retaliating." Thus, the plan was hatched for the managers to beat Moriarty and Relator to HR.

Tammy Vanderleest even requested that they all collaborate on a story via text, prior to going to HR.

E. Intense Pressure to Recruit Aggressively and Successfully

46.    DeVry pushes its military recruitment team to make the annual inquiry number goals set by their military managers so that military managers can receive their bonuses. There was always pressure for more numbers. Or as the manager, John Korsak, so directly put it, "**The primary role of a MVAR** (military team recruiter) **is to generate Inquiries**, and to do so via self-produced Events…. MVARs must conduct extensive and aggressive Prospecting activities in order to develop non-paid Inquiry-generating events." Recruiters were measured on recruitment numbers, and DeVry provided multiple ways to violate the DOD policy of not collecting military members' contact information while on military property in order to meet the numbers. It was always about the numbers.

47.    They say you can tell what a business is after by looking at what they incentivize and what they measure. As the head of all the managers, Joseph Mozden so clearly pointed out, DeVry measures the percentage rate of contacts (getting information) and the percentage rate of conversion (making contacts into admitted students). It is also evident that the team had been pushed to bring those numbers up as Mr. Mozden emphasizes that they "experienced low admissions contact rates and conversion levels …, [but] our contact rate has grown from 60% to 90% and

-20-

conversion has grown from 3.9% to 5.9%."

48.     From the first day military recruiters start at DeVry until they are terminated for not meeting their "numbers," they are taught that the only reason they are employed and receive a paycheck is to meet very high number requirements for "Events" and "Inquiries." As John Korsak reclarified, what was always clear about the job requirements—Events only count if you "generate at least 1 Inquiry." And not to be misunderstood, Mr. Korsak reclarified that an "Inquiry" is capturing any potential student's information. This can be done with an inquiry card, "MVAR landing pages, or other official DeVry mediums (i.e. DeVry website, 800 numbers)."

49.     Jenell Givelber provided Relator her first annual review in 2014. Not surprisingly, Relator was told to "drive Inquiries" and "conduct Events." These were the two main objectives listed on Relator's IPP. Relator was told that the military team had to complete a set amount of Events and submit a certain number of Inquiries every year in order to remain employed and not get written up.

50.     The pressure is constant and unrelenting. Often, because it affects their bonuses or IPP goals, Admissions Advisors will complain and recruiting managers will crack the whip. On one such occasion, one of the recruiters, Larelle Canela (formerly Gonzales), pushed back a little and Russ Gill excoriated her to encourage her to be more efficient in not only getting all the information admissions wanted, but to get better recruits so they could better convert them to students.

51.     The follow up reviews were no better. John Korsak and Relator were supposed to have weekly conference calls that were said to be recorded by DeVry. On a December 5, 2016 phone call with John Korsak, Relator was told to solicit/recruit from Military Recruiting Commands as a source of gaining more inquiries for the team. Relator asked Korsak where else she should try to recruit from, explaining to him that the annual numbers created by Greg Pace were unreasonable if they were not supposed to be soliciting military members' contact information while on military property. Korsak mentioned that Relator should go solicit recruiting commands. Because Relator did not want to argue with him, Relator responded to Korsak in an email, explaining why she was not permitted to solicit/recruit in this way per DOD regulation. Relator explained that a recruiting command is Government property, and the men and women would be on duty, so DeVry military recruiters could not solicit them. Korsak never responded to Relator's email. On January 20, 2017, Relator had her last one-on-one conference call with Korsak, and they only spoke for approximately 3 minutes. In this call, Korsak asked Relator why she had only gotten two inquiries from the previous week at military events. Relator told Mr. Korsak that it was because DeVry is not supposed to solicit at military program events according to DeVry's legal department and DOD policy. Korsak recommended that she find more events that she could solicit more inquiries from. Before the next one-on-one call, Relator was

-22-

terminated.

52.     Even the team-wide communications were full of pressure to meet the goals and individual performance plans.  On January 2, 2017, John Korsak sent out a team email telling the team to "take seriously our respective performance plans." He mentions that the team is in a deficit with inquiry numbers and tells them that they must turn that around.  Korsak also tells them to produce their own events and generate more inquiries through "aggressive Prospecting activities."

53.     Tammy Vanderleest was an MMA (manager) who was receiving a bonus based off of production.  In an email after a team call, she stated: "I have been monitoring the reports that reflect the number of events and inquiries being generated in the South region.  Again, as stated on the call, the military channel is down in terms of applications.  This is unusual for our channel.  I brought it to Jenell's attention that I believe numbers are down due to the lack of attendance at military events.  If a MEL/MLA is not actively pursuing military events in their territory the MMA will begin working events in that market.  The South is a great region in terms of military numbers however, it is not being reflected in the current activity taking place.  I feel that our numbers can increase dramatically but this requires increased event attendance and an increase in inquiries."  There are at least four problems with the way Ms. Vanderleest "encouraged" military team recruiters to increase their numbers.   First, this is after the ban on recruiting on military bases

-23-

and Ms. Vanderleest is pushing military base "Events" and "Inquiry" generation. Second, she is showing her hand on what recruiters are being measured by. Third, Ms. Vanderleest is admitting that managers would come in to territories to recruit (for which they are bonused). Fourth, managers are coming into territories and recruiting even though they are not licensed in those areas.

54.     There were constant team calls, PowerPoints, and emails focused on this same message. In one PowerPoint by Greg Pace, he highlights that "Grow[ing] our student enrollments" is the number one "MVA Team Essential Dut[y] and Responsibilit[y]." It establishes the team goals and metrics for going to 40 Events per week, obtaining 143 Inquiries per week, converting 8% of the Inquiries, and adding "300 new students." Not to be outdone, for the same fiscal year for which Greg Pace had just told them to get 300 students, Joe Mozden sent an email to the military team demanding that they finish[] the fiscal year with 1000 new students." The goals and the pressure made it nearly impossible to accomplish IPP goals created by DeVry's management team. Many team members were placed on a Performance Improvement Plans ("PIP") for not meeting their goals and quit or were fired by Korsak. One fellow employee resigned, prior to getting fired, after being put on a PIP. Two other employees were put on PIP's for low inquiry production and fired by Korsak prior to their probationary period being up. Korsak was given seven East Coast military representatives to manage, one quit and three were terminated in a

-24-

little over four months.

F. Workarounds

55.     Bonuses lead to pressure. Pressure lead to "workarounds," paying lead generators, and just direct violations. Relator was constantly pressured for numbers and conversions.   As is evident, DeVry had no interest in complying with Government regulations and only had an interest in making their numbers.  When military establishments made it difficult to openly gather information on base (with things like inquiry cards or signup sheets), managers told recruiters to get Service members' cell phone numbers and obtain the Inquiry information via text.  After that, management told recruiters to obtain the information through an 800 number or an online Inquiry card.   Recruiters would use their phones to have Service members provide the information by dialing the 800 number and handing the phone to the Service member or by logging on to the website and handing the phone to the Service member to fill out the form (or assisting them to do so).   Sometimes, they would just take the Service member's phone and dial or log on and assist the Service member providing DeVry the Inquiry information (their contact information). Recruiters might also push Service members to use their own phone, but, in any event, the pressure was on the recruiters to get the Service members' information one way or another.   Greg Pace was particularly intent on pushing these "workarounds" to get the numbers he wanted.  Management knew these were ways

-25-

to work around the rules. For example, when Alex Hightower, a military recruiter who worked with Relator, responded to one of Korsak's emails by admitting that they had been collecting via text messaging, even after Dawn Bilodeau told them not to, John Korsak responds, "I also understand that our use of texting was a 'work-around' to our inability to collect on-base."

56. From the moment DeVry realized that it could no longer openly place signup cards on recruiters' tables while recruiting at military events on military designated property, the entire military recruitment team violated the DOD regulation by simply collecting the same information via text. DeVry wanted to ensure that the team did not have cards on their tables, so that the Military Education Officers who ran these events would not think they were collecting. This "texting" workaround was created, so that they could still collect Service members' contact information while on military property during military events. Through new management, including Greg Pace and John Korsak, the policy continued openly. However, management introduced new "workarounds" over time including the "electronic sign up cards" where management insisted that recruiters obtain the same information as before, but more covertly on an electronic URL Landing Page that DeVry created for each military recruiter. This was true of the online form as well as the 800 number. The recruiters were still obtaining the same information from Service members on base—they just used cell phones instead of paper.

-26-

57.     DeVry always saw the federal rules and regulations as the roadblock to its greater success and tried to circumvent them. In his email demanding that they obtain 1,000 new students six months into the fiscal year, Joe Mozden specifically states: "Our team has never been stronger and more equipped to meet this 1000 new student challenge! And we have some great programs launching this second half to help us get there" [including] – "Reconsideration of Military Base Access – working with legal and compliance to level the playing field and hopefully help us get back to the way we once operated on the bases[.]" It is not as if Joe Mozden, Russ Gill, Greg Pace and the rest were unaware that recruiters could not obtain this information by any means (not just paper) while on military property or at military events, they were aware from the outset.

58.     On September 22, 2015, Relator forwarded to Russ Gill, an email from a friend who worked for Kaplan University. The Education Office from 29 Palms Marine Corps base sent this information out to military field recruiters who were attending their military event on base. On the list of information sent, it states: "School representatives are no longer authorized to collect information (names, phone numbers, email addresses, etc.) from Fair patrons. Collecting such information is prohibited, and any violators will be asked to leave the Fair immediately. If you have brochures or pamphlets where potential students or interested parties can fill out a form and mail it in order to receive more information

-27-

about your institution, than is fine.  However, you may not collect this information at the event itself.  Same-day enrollments are also prohibited; you may not meet with potential students one-on-one the same day of the event.  Please note that this is a change in policy from past events."  DeVry never stopped collecting this information and is doing so today.

59.     Russ Gill personally met with Dawn Bilodeau and understood perfectly well that no information could be obtained by any means.  However, DeVry waited until March 25, 2016 to make any changes and then only stated that the military recruitment team was no longer allowed to collect military members' information on inquiry cards per request of DOD.  That is when the text "workaround" went into full effect, and it was followed by the 800 number, the electronic contact information gathering through the URL Landing Page, and various other "workarounds."  In effect, DeVry never stopped obtaining the same information by other means (than an "inquiry card") and still obtains the same information to this date.

60.     A similar cavalier attitude was demonstrated to Relator when she asked management to train recruiters on acceptable methods under the federal rules and regulations.    Relator started by asking Jenell Givelber to provide training so that they could all make sure that they were acting in accordance to DOD regulations.  Relator asked this during team conference calls, and one-on-one calls.  Givelber's response was to tell Relator to read it herself, if she wanted to know about it.

-28-

61.     In early December 2016, as DeVry was about to make public its $100,000,000 settlement with the Government for deceptive practices nationwide, it moved away from capturing Inquiry information via text (an acknowledged "workaround" of DOD policy) and introduced a new form which had "disclaimer and opt-in language." However, DeVry was being too cute by half, since it insisted that the military team still obtain the same information on base, but now with a "disclaimer." The military team was still required to attend Events (which required at least one Inquiry) and obtain Inquiries on military property and does so to this day. Management made it clear that the only prohibition was using text to obtain information—all other "workarounds" were still available. This was before DeVry set the goal of obtaining 1,000 new students in six months. And never did DeVry deal with the other workaround—Lead Generating Entities.

### G. Lead Generating Workaround

62.     DeVry military recruiters have always been encouraged to affiliate with lead generating entities to obtain Inquiry information through them and by attending their meetings and presentations (on base). Two of these entities with which Relator worked most closely were EANGUS (Enlisted Association of the National Guard US) and LANGEA (Louisiana National Guard Enlisted Association). DeVry had contracts with these entities and many others like them that targeted military members for the purposes of solicitation.

63.     On July 22, 2016, Greg Pace sent Relator an email copying and pasting the benefits of a Tier 1 Platinum Corporate Membership of LANGEA. The verbiage states that one of the benefits of the LANGEA Specific Partnership is that members will receive the "contact list of those interested in your product or service (dozens of contacts several times per year)." In other words, LANGEA provides Service member referrals or contact information or "inquiries."

64.     On one occasion, early in Pace's tenure, he invited himself to the event that Relator was scheduled to attend called EANGUS. John Harris, who was the President of this organization, was also putting on this conference in his home state, Louisiana, where he is also in charge of LANGEA. Pace met John Harris at the golf tournament that kicks off the conference. At the EANGUS event that Pace attended with Relator, he signed up on the EANGUS app and asked Relator to contact the military members from the contact list on the app. When Relator and Pace were setting up the booth for the conference, Pace asked Relator why she did not bring the DeVry approved inquiry forms with her to collect contact information. Relator explained to him that, Dawn Bilodeau told the military team that they could not solicit military members' contact information. Greg Pace told Relator to still collect inquiries, and if they got in trouble, he would take the hit. Relator felt very uncomfortable collecting the contact information of military members that were interested in more information from DeVry, but also did not want to lose her job as

-30-

Pace was her new manager.

65.     At the event, Greg Pace sent out a mass team email with a picture of Relator at the booth.  Pace raved on a conference call about how Relator knew everyone and how much he had learned from Relator.  On August 25, 2016, Greg Pace emailed Relator requesting that she train the team on an overview of the National Guard and how to work with them.  Joe Mozden, Greg Pace's boss, sent a team email on August 31, 2016 praising Greg Pace for sponsoring and exhibiting at EANGUS as well as becoming a Platinum Member of LANGEA.

66.     Of course, these were not the only lead generators DeVry used.  DeVry also paid for databases of Service members/veterans from organizations like Recruit Military.  To Relator's knowledge, DeVry still uses this illegal "workaround" to obtain Inquiry information to this day.  In fact, in late October 2017, Laura Moriarty told Relator that DeVry was still illegally using Recruit Military to, inter alia, illegally recruit on base.  When Recruit Military merged with Bradley-Morris, Inc., they obtained events that they would be able to host on military bases.  DeVry's current contract with Recruit Military includes not only exhibiting on base during these events, but prior to the actual start of the career fair DeVry provides briefings and workshops targeting Service members and their families.  During these briefings, they are representing DeVry.  This is primarily done by Hawthrone Herbert (Harty) and John Korsak (who are directly bonused for their recruiting

efforts).  Laura Moriarty specifically asked John Korsak if the military managers were representing DeVry while on base during their briefings/classes and career fairs, and he said "yes."  Laura Moriarty then asked if he was requesting base access or obtaining permission from the Education Office to be there, and he said "no."  Korsak said that they were going as attendees of Recruit Military events on base, so DeVry didn't need permission from the Education Office.  Moriarty told Korsak that DeVry can get in a lot of trouble for not following the DOD rules.  (Many times in the past DeVry had recruiters attend career fairs at which they pretended to provide jobs only to solicit leads for going to school).  Nothing has changed.

### H. Continued Violation of the Solicitation Prohibitions

67.    The prohibition of collecting Service members' information to try to "convert" them to students started at least in 2014 (if not before), which is when Relator started back with DeVry.  DeVry had a choice to make.  Either DeVry would focus on compliance, with policies, training, review, auditing, and follow up or it would fail to establish policies, educate, train, review, audit or in any way comply with the prohibition.    DeVry chose the latter and went one step further— circumvention.

68.    The entire mechanism of Service member education was focused on obtaining information and converting Service members to students.  Those were the metrics.  Those were the job requirements.  Those were the basis for bonuses of up

to a half a million dollars. Therefore, while needing to occasionally pay lip service to the regulations, DeVry was all about obtaining information from Service members, and that never stopped.

69.     Even the pinnacle of the façade did not change the gathering of information on military property. John Korsak's December 2, 2016 team email stated, "**Any potential student's request for information must be captured** and collected on an approved DeVry University inquiry form with the most recent/relevant disclaimer and opt-in language listed." (It expressly allowed all previous "workarounds" other than texting). The regulations were not about the form used or the opt-in or opt-out nature of the form much less the legal jargon denominated "disclaimer." The point of all the rules and regulations (and agreement with DOD) is to prevent for-profit colleges from collecting Service members' information on base AT ALL. This window dressing of a policy still has as its fatal flaw the continuation of collection on base and the continued tracking and measuring of Events (where one Inquiry is required) and Inquiries (good enough to convert). (Event does not count unless you get at least one Inquiry). This "new" policy is not a new "policy," but a new form to continue to violate all the policies and agreements. The directive is still for the military team to collect Inquiries on base.

70.     Shortly after this whitewash policy was introduced, on a conference call with the East Coast team on December 6, 2016, Korsak admitted that he personally

(and illegally) solicited Coast Guard members while on a Coast Guard base at an Event. A fellow coworker from Chamberlain College of Nursing (now Chamberlin University), Robyn Hinchey, confirmed to Relator that this was true. Hinchey also attended the Coast Guard event where she witnessed Korsak soliciting "Coasties" on DeVry inquiry forms. Hinchey knew that DeVry had been told by DOD not to collect military members' contact information while on base, so she did not have any sign up cards on her table. When Relator asked Hinchey why she did not tell Korsak that DeVry could not collect per DOD regulations, Hinchey said that she did not feel comfortable correcting a military manager on the DeVry side.

71.     Around the time of the "new policy," John Korsak took away Louisiana as one of Relator's territories. At that time, he told Relator that if there was a beneficial Event in Louisiana, to ask if she could attend. Relator emailed Korsak an Event, which was clearly on a military property in Louisiana, and he responded by asking how many Inquiries Relator expected to collect from this Event. There never was any intent by any management at DeVry to stop getting Inquiries from on-base Events—in fact, it was the only way recruiters could get credit for going and retain their jobs.

72.     DeVry never cared about compliance and pushed noncompliance on the entire military team. For example, on January 2, 2017, John Korsak sent out a team email telling the team to "take seriously our respective performance plans." He

-34-

mentioned that the team is in a deficit with Inquiry numbers and told them that they must turn that around.  Korsak also told them to generate more Inquiries through **"aggressive Prospecting activities**."  (Emphasis added).  For context, Korsak posted a year-to-date chart of each recruiter's Events with Inquiries, Inquiries, Prospects, Applications and each recruiter's Inquiry to Application Conversion Rate. Korsak continued by telling the team that "Prospecting" (their "principle job function") is asking for briefing opportunities "and ultimately gathering Inquiries from those activities."  This includes "briefing" Government organizations.  Of course, that is exactly where this all started, with for-profit colleges "briefing" Service members on base.  That is exactly what military educational recruiters are not supposed to do and especially where it "ultimately" involves "gathering Inquiries for those activities."  Korsak specifically says that "Prospecting targets can be government," which for the "military team" clearly means military and DOD personnel. This violates everything that they were told not to do by Dawn Bilodeau.

73.    On a January 23, 2017 team meeting conference call, team member Rosalinda Archuleta-Pintor (out of Florida) asked Greg Pace what a Personally Developed (PD) Lead is if they are not allowed to collect military members' information via phone calls, emails, or text messages to enter them into a category of Salesforce which would allow them to be contacted by a DeVry advisor to answer their questions.  Pace asked his lower level managers to answer her question, and no

one, including Pace, answered.  Right after the call, John Korsak, generated an email to the East Coast team, copying in Jenell Givelber, Harty Herbert, and Greg Pace. Korsak copied in his initial email regarding "Inquiry Policies" from December 2, 2016 and attempted to answer her question.  Then he confirmed the underlying problem.  DeVry's policy was and would forever be that when you were on base (or Government property) and you were "engaged in a conversation with someone," "they can fill out an Inquiry Card, and then you can enter that individual as an Inquiry in Salesforce[.]"  This shows that DeVry was still collecting Service members' contact information, even after being told not to do so by Dawn Bilodeau.  Relator pushed back a bit in a reply email asking where recruiters could view this policy and other policies regarding referrals.  Korsak immediately called Relator and threatened her by saying, "I would not do that again, because that is not the way we are going to do things" (meaning he was upset that Relator had copied everyone on the email questioning him).  Relator explained that she was not trying to challenge him, but that she was clearly not the only one under him that was confused about referral policies.  Relator asked Korsak where he was getting these policies from so that they could all have a reference.  He told her that he would try to find it.  Then, Korsak sent Relator a private email, which expressed his complete lack of concern for complying with any Government rules or regulations.

**I do not have any direct visibility on specific laws or regulations** related to

institutes of higher education, and their **legal or regulatory compliance requirements**. I observe corporate policy, and trust that our compliance division has a reason for putting in place the policies we have.

(Emphasis added).   Then Korsak told Relator if she wanted to know what the regulatory compliance requirements were she could research that herself.

74.    Also, the Team Meeting PowerPoint from January 2017 highlights the fact that DeVry was going to continue to violate the rules and regulations in order to obtain more Service member students and more Government money.  This is the presentation with the FY17 goals for Events, Inquires, and Conversion Rates (and 300 new students).  The first information after the goals is the fiscal year-to-date Events statistics. The Events are the type of Events that are prohibited by regulation and agreement.  This shows that in 2016 DeVry attended 617 on-base events for 82% of their Events.  In FY 2017 (to date) DeVry had attended 486 on-base Events for 60% of their Events (and they anticipated 71 additional on-base Events for the year).  DeVry continued to solicit on military property.  DeVry tracked solicitation on military property (Events only count with at least one Inquiry).  DeVry planned to continue to solicit on military property.  The very next page focused on showing how more Inquiries lead to more new students.  In the fiscal-year-to-date analysis it shows that DeVry had at least 264 on-base inquiries with a conversion rate of 8.33%, which led to 20 new students.  This presentation focuses on the number one goal...

-37-

"Grow our student enrollments." The number one essential duty and responsibility of the military team ... "Grow our student enrollment." How does DeVry's military team reach the number one goal? "**Military Inquiries**." (Emphasis in original).

75.     Things have gotten worse—not better.  In a mandatory team call in November 2017, Greg Pace and John Korsak told the team to collect military members' contact information on bases.  While they were talking about on-base solicitation, team member Rosalinda Archuleta-Pintor admitted that she had recently solicited 13 military members' contact information from a Yellow Ribbon Program (which is Government property).

76.     The DeVry military team is again mandated to collect military members' contact information, but now it is specified that it is to be done electronically on an iPad that sits on their table at military events and bases.  In the November call, Laura Moriarty asked the managers questions to clarify that this was the official policy.  There was a long pause and Greg Pace finally answered that yes, they can collect on base property.  Using the excuse that other schools were collecting on base, Joe Mozden formally "revisited" the on-base collection policy as he mentioned in an email and chose to change it.  DeVry is back to openly recruiting on base.

## I.  No Efforts Were Made at Supervision or Compliance

77.    On occasion, DeVry will pay lip service to compliance or to the DOD regulations banning solicitation and the collection of information, but it is clear that DeVry made no efforts to supervise the recruiters in the field, much less to teach or train them on compliance with the regulations.  Almost always it was Relator or another recruiter who would raise the issue or try to educate the management team.

78.    Prior to 2016, recruiters were not allowed to attend CCME (Council of Colleges and Military Educators).  It was the managers who learned about the regulations, the DOD MOU, etc.  In February 2016, Russ Gill allowed Relator to attend the CCME, but designated which breakout sessions she was to attend.  Not surprisingly, none of them had to do with compliance.

79.    At this CCME in another breakout session, Dawn Bilodeau gave a presentation.  She addressed the Executive Order, DODI, and the DOD MOU. During this briefing, the question was raised if schools can collect military members' contact information while at sanctioned military events.  Bilodeau said that no school was permitted to collect military members' contact information.  (While Relator was not at this briefing, Jason Brooks from Columbia Southern approached her to ask if she had heard that colleges/universities were no longer allowed to collect military members' contact information).  Relator took the information straight to VP Russ Gill and asked if he had heard this in any of his briefings.  Gill said that he had heard

-39-

about it and would schedule a meeting with Dawn Bilodeau. He scheduled a meeting with Dawn Bilodeau and was directed that DeVry's military recruitment team were not allowed to collect Service members' Inquiries while on military property. Gill produced the aforementioned policy in March 2016, and the issue was addressed in the MVA Playbook on pages 6 and 8. This did not change the team goals or performance reviews. It did not result in any training, supervision, or compliance oversight. In fact, this is where the acknowledged "workaround" of using text messages was created (which continued until December 2016).

80.   In March 2016, Relator was told by Russ Gill (per legal) that the military team is not allowed to collect contact information from Service members on a military base, installation, Table/Fair/Workshop, or Yellow Ribbon Programs. At the end of January 2017, those were exactly the Events that Pace and management were tracking. In the interim, the military team was not told about these things and compliance was hardly ever discussed. On occasion, management would cursorily use the word compliance, but there was no education, training, supervision, or follow-up on these issues. As noted above, Relator would ask about regulations, compliance, and policies and was told to find them herself.

81.   DeVry had no interest in real compliance. In her entire time with DeVry, no manager ever shadowed Relator in the field to provide additional training or ensure she was in compliance. The military team never had any HR or compliance

person who was designated to the team to ensure their compliance (or train them) on DOD regulations that they were mandated to follow. Even when Relator begged management to train the team on the DOD MOU, they did nothing ("find it and read it yourself"). There was never any training on lead generating entities, incentive income, state licensing, or compliance with the non-solicitation of DODI and DOD MOU.

J.  State Licensing Requirements

82.   As part of the control and oversight of for-profit recruiting, states require recruiters to be licensed in the states in which they recruit. All the team members on the military recruiting team for DeVry (with one possible exception) were not licensed the entire time Relator was with the team and beyond. At last check, they still were not licensed.

83.   DODI Section 3(f)(2) requires that all institutions "[a]re in compliance with State authorization requirements consistent with regulations issued by ED including part 600.9 of Title 34, Code of Federal Regulations (Reference (t)). Educational institutions must meet the requirements of the State where services will be rendered to include compliance with all State laws as they relate to distance education." To further emphasize this, Section 4(a) states that all institutions seeking access to DOD installations "must meet the criteria in paragraphs 3f(1) through 3f(5) of this enclosure." Page 2-3 of the DOD MOU ((3)(d)) states that "Educational

institutions must: Comply with state authorization requirements consistent with regulations issued by ED, including 34 C.F.R. 600.9. Educational institutions must meet all State laws as they relate to distance education as required." State licensing is a standard policy for all recruiters at any school. The managers at DeVry knew that everyone was supposed to be licensed in each state in order to recruit in that state. They just didn't care.

84.    When Relator came back to DeVry in 2014, she was asked by her National Director Jenell Givelber and Shawnte Segers to indicate on some forms what states she would be working in so she could be licensed. Relator was told that Ms. Segers would forward her request for licensing to the licensing department. No one got back to her. Relator never filled out any licensing documentation. Finally, Relator re-inquired about state licensing to VP Russ Gill in January 2016, via email. She knew that fellow recruiters in the industry were not recruiting in certain states because they did not have a license to do so. Relator wanted to make sure she and her fellow teammates were in compliance, so that DeVry did not get in trouble. Russ Gill placed Relator in charge of email communication to April Young on behalf of getting the team licensed. Multiple emails went back and forth for months. Around May 2016, Relator was told by Russ Gill to hold off because there may be some changes coming. He said he was in the process of changing the military recruiting positions and did not want to license people if they were not going to stay under the

new positions. DeVry's military team did not hear anything about licensing again until Relator brought it up to Greg Pace, on October 17, 2016 in an email. Pace replied back that he would forward that request to Jenell Givelber, as that was her responsibility. Relator did start the state licensing application process at the end of 2016. She and coworker Laura Moriarty were still receiving authorized licensing paperwork emails from DeVry's licensing department up through January 13, 2017. Relator was terminated on February 2, 2017—not sure if DeVry ever submitted her paperwork.

85.     After Relator's termination, nothing changed. On May 25, 2017, the East Coast team met in Georgia for a team meeting. Relator was told that the invitees were: John Korsak, Hawthorne Herbert, Joe Mozden, and Greg Pace. Laura Moriarty told Realtor that she brought up the licensing issue and mentioned that she doesn't even know if she is state licensed or authorized to recruit in her region. Moriarty stressed the importance of licensing to the managers. They did not respond.

K. 20 Student Requirement

86.     DODI page 25, Section 4(b) states that in order to provide counseling or student support services at any DOD installation, DeVry must have at least 20 military students actively attending DeVry. DeVry managers were aware of this issue. For example, a Military Education Service Officer at Ft. Stewart wrote an

email to Tammy Vanderleest stating: "DOD is currently not allowing visits to installations for the purpose of advising their students unless they have 20 or more DOD students. What that means for DeVry at Ft. Stewart (including HAAF and Ft. Gordon), based on what you have attached here, is that while DeVry may be authorized on-post on a case-by-case basis for the purpose of attending education fairs or MWR activities (with prior approval from our office), we will not be able to allow you to make quarterly visits to the education center for the purposes of advising your students. Once that number hits 20 or higher, please let us know and we will be able to go from there."

87. DeVry managers never educated the military team on this issue. In fact, when it came up, management made the recruiters believe that it was 20 students across the U.S.—not per base. DeVry did not care about this requirement. In 2015, Relator found out about this requirement through the request of an Education Officer on a base and asked management for assistance in complying with this rule. However, DeVry does not have a mechanism for pulling a list of current students on base—even though it could be required by any DOD POC at any time. DeVry military recruiters were routinely working on bases that did not have 20 students. Relator is aware of many events where her team counseled students, but where DeVry did not have at least 20 active students on base. DeVry never required anyone to check that there were 20 students before its agents went on base (and couldn't do

-44-

so even had it wanted to).

## **WRONGFUL TERMINATION/DISCRIMINATION**

88.     Throughout her tenure with DeVry, Relator tried to stop a variety of false claim schemes including improper recruiting, improper remuneration, failure to license and failure to maintain 20 students on base.   Several of Relator's supervisors and DeVry managers were aware of her activities and they engaged in several attempts to thwart Relator's protected activities.  DeVry managers were also aware that Relator was actively investigating FCA matters when she openly asked for access to the applicable rules and regulations.  Defendants attempted to derail any possible investigation and ultimately terminated Relator's employment because of these protected activities.

89.     Before and after her termination, Relator was hassled and harassed in retaliation for her protected activity.  For example, John Korsak was chosen by HR at DeVry to submit Relator's final expense report.  He purposely omitted the expense for Relator's cell phone bill of $100, stating that she had to provide every page of her personal cell phone bill. This was never the policy. After Relator was terminated and John Korsak denied her cell phone bill expense on her final report, he approved fellow coworker Laura Moriarty's cell phone bill with only the first page of her bill.

## FIRST CAUSE OF ACTION
### (False or Fraudulent Claims)
(False Claims Act 31 U.S.C. § 3729(a)(1)(A))

90.     Relator hereby incorporates and re-alleges all other paragraphs as if fully set forth herein.

91.     As set forth above, Defendants, by and through their agents, officers, and employees, knowingly presented, or caused to be presented to the United States Government numerous false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

92.     Due to Defendants' conduct, the United States has suffered substantial damages.

93.     The United States is entitled to treble damages based upon the amount of damage sustained by them in an amount that will be proven at trial.

94.     The United States is entitled to the largest civil penalty allowed by law for each of the false claims.

95.     Relators are also entitled to their attorney's fees and litigation expenses.

## SECOND CAUSE OF ACTION
### (False Statements)
(False Claims Act 31 U.S.C. § 3729(a)(1)(B))

96.     Relator hereby incorporates and re-alleges all other paragraphs as if fully set forth herein.

-46-

97.     As set forth above, Defendants, by and through their agents, officers and employees, knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

98.     Due to Defendants' conduct, the United States has suffered substantial damages.

99.     The United States is entitled to treble damages based upon the amount of damage sustained by them in an amount that will be proven at trial.

100.    The United States is entitled to the largest civil penalty allowed by law for each of the false claims.

101.    Relators are also entitled to their attorney's fees and litigation expenses.

### THIRD CAUSE OF ACTION
### (Retaliation Against Relator)
(False Claims Act 31 U.S.C. § 3730(h))

102.    Relator hereby incorporates and re-alleges all other paragraphs as if fully set forth herein.

103.    Defendants violated Relator's rights pursuant to 31 U.S.C. § 3730(h) by retaliating against her for her protected activities.

104.    As a result of Defendants' actions, Relator has suffered damages in an amount to be shown at trial.

105.    Pursuant to this statute, Relator is entitled to be reinstated at the same level of seniority she would have enjoyed absent Defendants' illegal acts; an award of no less than two times the amount of back pay plus interest; compensation for special damages; and litigation costs and reasonable attorneys' fees.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Relator Ashley Vandiver prays for judgment:

a.    awarding the United States treble damages sustained by it for each of the false claims;

b.    awarding the United States the largest civil penalty allowed by law for each of the false claims;

c.    awarding Relator 30% of the proceeds of this action and any alternate remedy or the settlement of any such claim;

d.    awarding Relator two times back pay, interest, and special damages resulting from retaliation;

e.    awarding Relator her litigation costs and reasonable attorney's fees; and

f.   granting such other relief as the Court may deem just and proper.


Respectfully submitted,


Mike Bothwell
Ga Bar No. 069920
Mike@WhistleblowerLaw.com
Attorney for Relators

BOTHWELL
LAW GROUP
304 Macy Drive
Roswell, Georgia 30076
Ph: 770-643-1606
Fax: 770-643-1442